No. 96-490

IN THE SUPREME COURT OF THE STATE OF MONTANA

1997

TAMI KAPTEIN, a minor child, by and through
her parents KATHY KAPTEIN and MARVIN KAPTEIN,

Plaintiffs and Appellants,

v.

CONRAD SCHOOL DISTRICT, STATE OF MONTANA,

Defendant and Respondent.

APPEAL FROM:   District Court of the Ninth Judicial District,
In and for the County of Pondera,
The Honorable Marc Buyske, Judge presiding.

COUNSEL OF RECORD:

For Appellants:

Cameron Ferguson; Hartelius, Ferguson, Baker & Kazda
Great Falls, Montana

For Respondent:

Ronald F. Waterman and Catherine M. Swift; Gough,
Shanahan, Johnson & Waterman, Helena, Montana

For Amicus:

Janice Frankino Doggett, Attorney at Law, Helena,
Montana (for Montana School Boards Association)

Elizabeth A. Kaleva, Attorney at Law, Helena,
Montana (for School Administrators of Montana)

Dennis Moreen, Attorney at Law, Helena, Montana
(for Montana Education Association)

Geralyn Driscoll, Attorney at Law, Helena, Montana
(for Office of Public Instruction)

Jock O. Anderson, Attorney at Law, Helena, Montana
(for Montana High School Association)


Submitted on Briefs: January 16, 1997
Decided: February 6, 1977
Filed:

_____
Clerk

Justice W. William Leaphart delivered the Opinion of the Court.


Kathy and Marvin Kaptein (Kapteins) are residents and taxpayers in Conrad, Montana.  In October of 1995, the Kapteins filed suit in the Ninth Judicial District Court, Pondera County, asking the court to enter a judgment requiring that the Conrad School District Board of Trustees allow their 7th grade daughter, Tami, to participate in the public school sports programs.  Tami was, and is, a student at the Conrad Christian School.  The private school in which Tami is enrolled offers ski days and arranges for basketball practices and an intramural game.  The Conrad area offers some additional athletic programs which Tami participates in, for example, soccer and softball.  In addition, Tami seeks to play on the public school athletic teams for social purposes related to friendship and team camaraderie.  Tami participated in the public school girls' sports program during the 1994-95 school year.  This participation was without the approval of the Superintendent or the Board of Trustees.  Her participation in the public school program was terminated upon discovery by the Board of Trustees.  The Board of Trustees refused to allow Tami to further participate in the public school sports programs since the Boardþs policy limited participation to students enrolled full time in public school.  The Kapteins contend that the schoolþs policy is unconstitutional under the provisions of Article X, Section 1 of the Montana Constitution.  On November 20, 1995 the District Court issued a preliminary injunction which allowed Tami to play 7th grade volleyball.  Subsequently, both parties moved for summary judgment.  The District Court upheld the constitutionality of the Boardþs policy, granted summary judgment for the Conrad School

District and dissolved the preliminary injunction. The Kapteins then sought an injunction pending appeal under Rule 40, Montana Rules of Appellate Procedure, which this Court denied. We affirm the District Courtþs grant of summary judgment.

DISCUSSION

The Kapteins based their constitutional argument on Article X, Section 1, of the Montana Constitution, which states:

It is the goal of the people to establish a system of education which will develop the full educational potential of each person. Equality of educational opportunity is guaranteed to each person of the state.

Citing our decision in State, ex rel., Bartmess v. Board of Trustees (1986), 223 Mont. 269, 726 P.2d 801, Kapteins contend that Tami has a constitutionally protected right to participate in public school extracurricular activities and that this Court should apply a middle-tier analysis in balancing Tamiþs right to participate against the governmental interests to be served by infringing that right. The School District takes the position that middle-tier analysis is not appropriate in this case and, even if middle-tier analysis were applied, the schoolþs educational interests in permitting only students enrolled in the school district to participate in school-sponsored extracurricular activities outweighs any right that Tami may have to participate.

Our review of cases from other jurisdictions reveals no decisions, federal or state, which recognize a constitutional right of a nonenrolled student to participate in a public school sports program.

The United States Constitution, unlike the Montana Constitution, does not explicitly or implicitly guarantee a right to education. San Antonio Indep. School Dist. v. Rodriguez (1973), 411 U.S. 1, 35, 93 S.Ct. 1278, 36 L.Ed.2d 16. In keeping with the Rodriguez precedent, the federal courts have applied a rational relationship test to claims that private school students have been unconstitutionally excluded from participating in public school extracurricular activities. In Denis J. OþConnell High School v. Virginia High School League (1978), 581 F.2d 81, a parochial school sought admission to the Virginia High School League which regulates and governs all athletic, literary and debating contests between the public high schools in the state of Virginia. The private school contended that, in restricting membership to public high schools, the League, and thus the state, was violating equal protection. The Fourth Circuit held that, since there was no fundamental right or suspect classification involved, the classification would be subject to the rational relationship test. Denis J. O'Connell High School, 581 F.2d at 84. The court held that the classification was rationally related to the League's policy of limiting student transfers to defined geographic areas

and of discouraging the recruiting of students for purposes of athletic competition. Since private schools in Virginia suffer no geographic limitation with respect to the areas from which they may draw students, the court held that admission of private schools into the League would undermine that policy. Denis J. O'Connell High School, 581 F.2d at 84-87 Accord Valencia v. Blue Hen Conference (D. Del. 1979), 476 F.Supp. 809, 826 (holding that the public high school association's exclusion of private schools was supported by legitimate interests in preventing athletic recruiting and maintaining a competitive balance among schools within the association).

We note the following three decisions from foreign jurisdictions which address the question of whether a nonenrolled student has a right under state law to participate in public school courses or extracurricular activities.

In Swanson v. Guthrie Independent School Dist. No. I-1, et al. (D. Okla. 1996), 942 F.Supp. 511, parents who were home schooling their daughter sought permission from the board of education to have their daughter attend the public school on a part-time basis. The board denied the request and adopted a policy that required all students enrolling in the Guthrie Public Schools to do so on a full-time basis. Swanson, 942 F.Supp. at 512. The parents challenged the policy on various grounds including a contention that the policy violated the childþs constitutional right to attend public schools and her right to a free public education under the Oklahoma Constitution which provides constitutional guarantees of a "system of public schools . . . open to all of the children of the state" as well as a "system of free public schools wherein all the children of the state may be educated." Swanson, 942 F.Supp. at 514. The court acknowledged that under Oklahoma law, home schooling is considered an alternative education option. The court concluded, however, that the parents were seeking to "judicially abrogate the equivalency requirement for home schooling and replace it with an absolute right to use public schools to supplement the home school education. [Citation omitted.] This the Court will not do." Swanson, 942 F.Supp. at 515. In rejecting the parents' contention that the Oklahoma Constitution gave them the right to choose public school courses on a piecemeal basis, the court said:

> Plaintiffs have failed to provide any evidence that defendants have deprived Annie of her right to a free public education. Annie has always been and continues to be entitled to a free public education. Nor have Plaintiffs provided any support for their contention that they may "pick and choose" what courses Annie will take in the public schools. Oklahoma law is clear that the local boards of education have the power to "[m]aintain and operate a complete public school system of such character as the board of education shall deem best

suited to the needs of the school district."
Okla.Stat.Ann.tit. 70  5- 117(A)(3) (West Supp. 1995-96).  The Oklahoma Legislature has also vested the State Board of Education with the authority to determine curricular standards for public schools.  See Okla.Stat.Ann.tit. 70  11-103.6 (West Supp. 1995-96) ("By February 1, 1991, the State Board of Education shall adopt curricular standards for instruction of students in the public schools of this state that are to be implemented not later than the 1993-94 school year.").
In light of existing Oklahoma law, the Court finds Plaintiffs' reliance on School Board, District No. 18 of Garvin County v. Thompson, 24 Okla. 1, 103 P. 578 (1909) is misplaced.  [Footnote omitted.]  The Court also declines to adopt Plaintiffs' strained interpretation of Oklahoma law to create a right to a free part-time public education.

Swanson, 942 F.Supp. at 514.

In Thomas v. Allegany County Board of Education (Md.Ct.Spec.App. 1982), 443 A.2d 622, 626, the appellate court applied heightened scrutiny to the claims of private school students who requested to participate in an all-county music program offered to full-time students enrolled in the public schools.  The court applied the "compelling state interest" test to determine whether the boardþs rule limiting participation to school district enrollees violated the equal protection clauses of the state or federal constitution.  Thomas, 443 A.2d at 626-27.  The court utilized the heightened scrutiny test because the private school students claimed that their exclusion infringed upon their freedom of religion under the free exercise clause of the First Amendment.  The court concluded that the school district had satisfied the compelling state interest test in view of the "de minimi burden on the appellantþs freedom of religion and the legitimate interest in avoiding administrative inefficiency."

Thomas, 443 A.2d at 626.

Although the administrative impact of a decision mandating the participation of the private students into this public school program appears to us to be trivial, the precedent as it affects the broader spectrum of school administration is of a far more deleterious nature.  With the opening of such "Pandoraþs box", there would be no device to preclude, for example, a private school having difficulty securing a qualified chemistry teacher from unilaterally deciding to transport the entire student body to a nearby public school for their chemistry education.  The potential for administrative disruption is obvious.  Thus, while we may agree that

little if any administrative hardship would inure to the Board in permitting these three students to participate in the All-County Band, it is not for this Court to hold that the Board must admit them, in view of the broader implications involved. We think the school administrators and not courts, should decide how much administrative disruption is too much.

Thomas, 443 A.2d at 625-26.

The plaintiffs in Thomas also argued that, since the Maryland Constitution guaranteed "a thorough and efficient System of Free Public Schools . . ." that they, as school-age children, were entitled not merely to be admitted to the public schools, but to any part or portion of the public school system which they choose. Thomas, 443 A.2d at 627. The court rejected this contention in view of the unreasonable burden such construction would place on the efficient administration of the public school system. The court recognized that if the legislature or school board wished to permit participation by parochial students, the court saw no impediment but did not think it was for any court to mandate the admission of those students. Thomas, 443 A.2d at 627.

Kapteins cite to the Michigan decision in Snyder v. Charlotte Public School District, Eaton City (Mich. 1984), 365 N.W.2d 151. In Snyder, the Michigan Supreme Court held that a private school student was entitled to enroll in a public grade school band course. In Snyder, the Michigan Supreme Court specifically declined to rule on the basis of constitutional arguments, relying instead upon a 60-year history of such sharing between public and private schools in Michigan and an interpretation of Michigan statutory law which permitted the "sharing" of school programs. Snyder, 365 N.W.2d at 157. In recognition of the potential problem acknowledged by the Maryland court in Thomas, i.e. private school students picking and choosing among various core academic courses, the Michigan court limited its decision to certain nonessential elective courses like band, art and shop. Snyder, 365 N.W.2d at 161-62.

Kapteins suggest that we should decide this case solely upon the basis of Tamiþs right to participate in extracurricular activities; that we should not consider any "worse case scenarios," and that we can, as the Michigan court did, narrowly craft a decision recognizing a right to participate only in certain nonacademic activities such as sports, shop, band and art. Given that Kapteins are asserting a constitutional right to the "full educational potential of each person" under Article X, Section 1, of the Montana Constitution, Tami's appeal cannot be decided in such a vacuum. If Tamiþs right to participate in extracurricular activities outweighs the School Districtþs interest in limiting

participation to enrolled students, then Tami will not be the only nonenrolled person entitled to partake of the public school programs. Home-schoolers, dropouts and adults would have a right equal to that of private school students such as Tami Kaptein to participate in school programs on a part-time or piecemeal basis. Furthermore, as recognized by the Maryland court in the Thomas decision, there would be nothing preventing a private school from unilaterally deciding to transport its entire student body to the public school for purposes of taking an academic course such as computer science. Thomas, 443 A.2d at 626.

Having reviewed some of the relevant decisions from elsewhere around the country, we turn to a discussion of two Montana decisions which address a studentþs right to participate in extracurricular activities: Moran v. School District #7 Yellowstone County (D. Mont. 1972), 350 F.Supp. 1180 and State, ex rel., Bartmess v. Board of Trustees (1986), 223 Mont. 269, 726 P.2d 801.

In 1972, the United States District Court for the District of Montana was presented with an issue as to whether a public school could, pursuant to school policy, prohibit a student from participating in extracurricular activities because the student was married. Moran, 350 F.Supp. at 1181-82. Moran argued that, in violation of the equal protection clause, the policy discriminated against married persons without any reasonable basis. The school district argued that the policy was justified as it helped discourage teenage marriages and helped those students who did marry to achieve academic success. Moran, 350 F.Supp. at 1183. The court rejected these rationales, stating:

There is no legislative authority for school board action in the area of matrimony. What married persons do with their time outside of school and how they discharge their matrimonial responsibilities is outside the statutory authority of the school board.

Moran, 350 F.Supp. at 1186. Judge Murray then went on to point out that if encouraging academic success of married students is the stated goal, that goal could be achieved in a nondiscriminatory fashion by tying participation in extracurricular activities to academic performance for all students, not just married students.

Further, a simple requirement that those unable to keep up academic work may not participate in extracurricular activities would have the same effect as limiting married students to academic work if the extra activities are the cause of the academic failure but this of course would be in no way discriminatory. This simple and easy method of ensuring that participation in extracurricular activities by any student is not done at the expense of his academic work dramatizes the prejudicial and invidious effects of

the Boardþs rule.

Moran, 350 F.Supp. at 1186.

For the above reasons, the federal district court issued a preliminary injunction restraining the board from enforcing its rule excluding married students.  Moran, 350 F.Supp. at 1187.

Fourteen years later, the Helena School District adopted the very policy envisioned in Moran.  That is, the Helena District integrated academic performance and extracurricular activity when, for purposes of furthering academic achievement, it adopted a policy requiring that no student (regardless of marital status) could participate in extracurricular activities unless he or she maintained a 2.0 grade point average.  Bartmess, 726 P.2d at 802.  The relators in Bartmess argued that the right to participate in extracurricular activities was a fundamental right and challenged the 2.0 rule as being a denial of equal protection and equal educational opportunity.  Bartmess, 726 P.2d at 802.  Without addressing the question of whether education itself is a fundamental right, we held that participation in extracurricular activities was not a fundamental right; that the claim warranted a middle-tier analysis and that the 2.0 rule did not violate either the equal protection clause or the equal educational opportunity clause found in Article X, Section 1, of the  Montana Constitution.  Bartmess, 726 P.2d at 804-805.

We determine that Kapteins' claim of a right to participate, like the relators in Bartmess, must be analyzed under a middle-tier analysis.  We recognized in Bartmess that a studentþs right to participate in extracurricular activities, although not a fundamental right, is "clearly subject to constitutional protection."  Bartmess, 726 P.2d at 805.  Under a middle-tier analysis there must be a "balancing of the rights infringed and the governmental interest to be served by such infringement."  Butte Community Union v. Lewis (1986), 219 Mont. 426, 434, 712 P.2d 1309, 1314.  Thus, in the present context, the  right to participate must be balanced against the School Districtþs interests in restricting participation to students enrolled in the public school system.  Consistent with the middle-tier analysis conducted in Bartmess, we must first determine whether the classification based upon enrolled students is reasonable.  We then examine whether the governmental interest in making this classification based upon enrollment is more important than Tami Kapteinþs interest in participating in existing extracurricular activities.

As to the "reasonableness" of classifying students based upon whether they are enrolled in the public school system, we note that Article X of the Montana Constitution places a heavy emphasis on the concept of an educational "system."  Article X, Section 1(1), states that it is the goal of the people to "establish a system of education which will develop the full educational potential of each

person."  Article X, Section 1(3), provides: "The legislature shall provide a basic system of free quality public elementary and secondary schools."  Article X, Section 9(1), creates a state board of education responsible for planning and evaluating programs for the stateþs "educational systems."

Article X, Section 9(3), creates a board of public education "to exercise general supervision over the public school system. . . ."  Given this heavy emphasis on the creation, supervision and quality of the stateþs educational "system," we hold that the School Districtþs classification of students based upon whether they are enrolled in the public school "system" is entirely reasonable.

We must then examine the School Districtþs interest in making this classification and weigh that interest against Tami Kapteinþs interest in participating.

The School District has set forth an extensive list of "educational reasons" for its policy of restricting participation to enrolled students.  We will not delve into the particulars of that list other than to note that the primary "educational reason" propounded by the School District is that of providing a unified program in which required academic courses, elective courses and extracurricular activities are "integrated" so as to complement each other.  The Board takes the position that the integrating of the academic and extracurricular activities does not lend itself to participation by nonenrolled students.  This rationale finds ample support in our decision in Bartmess.  In Bartmess, Helena School District No. 1 chose to adopt a policy whereby students in the system needed to maintain a 2.0 or "C" grade average for the preceding nine weeks in order to participate in extracurricular activities.  The 2.0 standard was a higher standard than the 1.0 average needed to graduate from high school and was not based upon any scientific or statistical studies showing academic improvement as a result of such a policy.  Bartmess, 762 P.2d at 802.  Although the label "integrating" was not used to characterize the policy in Bartmess, the Helena School District was, in effect, "integrating" the athletic/extra-curricular program with the academic program.  That is, the Helena School District made a policy decision that participation in extracurricular activities was tied to academic performance.  In upholding this integrated approach, we stated:

We are not able to conclude, as the relators urge, that an opportunity to participate in extracurricular activities is more important than the achievement of average academic performance.  We conclude that the government interests in developing the full educational potential of each person and providing a basic system of quality public education by the enactment of the 2.0 rule outweigh the studentsþ interest in participating in existing extracurricular activities.

Bartmess, 726 P.2d at 805.

In the present case, we are likewise unable to conclude that a private school studentþs interest in participating in extracurricular activities is more important than the School Districtþs policy decision that, in order to effectively integrate academics and extracurricular activities, it needs to restrict participation to those students who are enrolled in the public school system.

Accordingly, we affirm the decision of the District Court.


/S/   W. WILLIAM LEAPHART



We concur:


/S/   J. A.  TURNAGE
/S/   JAMES C. NELSON
/S/   TERRY N. TRIEWEILER



Justice James C. Nelson specially concurs.

I concur in our analysis and in the result of our decision, and I have, accordingly, signed our opinion. I write separately only to set forth my position on two points, one of which is mentioned in our opinion.

First, in the context of the narrow legal question that was at issue in State, ex rel., Bartmess v. Board of Trustees (1986), 223 Mont. 269, 726 P.2d 801, and in the context of the legal issue here, I agree that a student's participation in extracurricular school activities is not a fundamental right and that using middle tier analysis is justified.  We have correctly so limited our analysis to those facts.

Beyond the narrow issues addressed in Bartmess and in the instant case, however,  I do not want my agreement with our opinion to be read as any sort of concession that a Montanan's rights under Article X, Section 1, of the Montana Constitution, to equal educational opportunity and to "a basic system of free quality public elementary and secondary" education are anything but fundamental rights.

As our opinion points out, Montanans, uniquely, are constitutionally guaranteed important equal public education rights.  Moreover, the legislature is obligated by our constitution

to provide the mechanism that will enable each person in this State to exercise those rights to effectuate the goal of the people of this state "to establish a system of education which will develop the full educational potential of each person."  Art. X, Sec. 1, Mont.Const.

In that context, and as to those rights, I believe that such rights are, indeed, fundamental.  In truth, when one considers the obvious fact that, without a quality education, a person's ability to exercise his or her other constitutional rights is severely circumscribed, then it becomes readily apparent just how fundamental the educational rights set forth in Article X, Section 1, really are. In our modern, technological, information-oriented society one's constitutional right to seek gainful employment, to vote, to express one's views, to pursue life's basic necessities, to acquire and possess property and to seek safety, health and happiness, all, in a very real sense, depend upon a person's education.  And these are but just a few of the constitutional rights which Montanans enjoy.  Simply put, educational rights are fundamental because they are rights without which other constitutional rights would have little meaning.  See Butte Community Union v. Lewis (1986), 219 Mont. 426, 430, 712 P.2d 1309, 1311-13.

Second, as to the precise question at issue in the instant case, I would also conclude that Article X, Section 6, of the Montana Constitution prevents a public school district from allowing sectarian school students to participate in district activities.  This provision of Montana's Constitution provides:

Aid prohibited to sectarian schools.  (1) The legislature, counties, cities, towns, school districts, and public corporations shall not make any direct or indirect appropriation or payment from any public fund or monies, or any grant of lands or other property for any sectarian purpose or to aid any church, school, academy, seminary, college, university, or other literary or scientific institution, controlled in whole or in part by any church, sect, or denomination.  (Emphasis added).

Article X, Section 6, which was carried over from our 1889 Constitution, represents the Constitutional Convention's strong and continuing belief in the necessity to maintain Montana's public school systems apart from any entanglements with private sectarian schools and to guard against the diversion of public resources to sectarian school purposes.  As Delegate Burkhardt stated:

The primary and significant advantage secured by the present provision is the unequivocal support it provides for a strong public school system.  The traditional separation between church and state, an important part of the American social framework, has also become a

fundamental principle of American education. The growth of a strong, universal, and free educational system in the United States has been due in part to its exclusively public character. . . . Any diversion of funds or effort from the public school system would tend to weaken that system in favor of schools established for private or religious purposes.

Montana Constitutional Convention, verbatim transcript, March 11, 1972, Vol. VI at pages 2008-09.

If Tami is allowed to participate in the public school sports programs, it is clear to me that the School District will be providing aid, either directly or indirectly, to the Conrad Christian School in violation of this express prohibition of Montana's Constitution. This is so because sectarian schools derive their operating funds, for the most part, from tuition or church resources. To the extent that a sectarian school determines that it cannot afford, for example, a volleyball program, or a chemistry lab, or a band from these private sources, such schools can shift the financial burden of such programs to the public treasury by sending sectarian school students to the public school volleyball program, chemistry lab or band. In short, the public school district ends up effectively subsidizing the sectarian school's educational program. This is precisely what Article X, Section 6, prohibits--indirect aid to sectarian schools.

Moreover, Montana's constitutional prohibition against aid to sectarian schools is even stronger than the federal government's. The former expressly prohibits either direct or indirect aid, while the latter prohibits aid which is found to be "direct." See, e.g., Sloan v. Lemon (1973), 413 U.S. 825, 832, 93 S.Ct. 2982, 2987, 37 L.Ed.2d 939, 945, reh'g denied 414 U.S. 881, 94 S.Ct. 30, 38 L.Ed.2d 128 (tuition subsidies to parents of parochial students struck down) and Meek v. Pittenger (1975), 421 U.S. 349, 363, 95 S.Ct. 1753, 1762-63, 44 L.Ed.2d 217, 230, reh'g denied 422 U.S. 1049, 95 S.Ct. 2668, 45 L.Ed.2d 702 (direct loan of instructional materials has effect of advancing religion), and compare State ex rel. Chambers v. School District No. 10 (1970), 155 Mont. 422, 472 P.2d 1013 (Article XI, Section 8, of Montana's 1889 Constitution, the predecessor of Article X, Section 6, prevents the busing of parochial students even though busing was permissible under the federal constitution).

Accordingly, while I concur fully in our analysis and in our opinion, I am also convinced that Montana's Constitution expressly prohibits what Tami and the Conrad Christian School hoped to accomplish in this litigation. The School District may not allow her to participate in its programs unless she enrolls in the public school system.

/S/ JAMES C. NELSON


Justice W. William Leaphart concurs in the foregoing special concurrence.


/S/ W. WILLIAM LEAPHART


Justice Karla M. Gray, concurring in part and dissenting in part.


Notwithstanding my disagreement with the Court's analysis of the issue before us, I concur in the result the Court reaches. The basis of my disagreement is set forth briefly below, followed by a brief statement of my view regarding the appropriate constitutional basis on which this case should be resolved. In this latter regard, I join in Justice Nelson's reasoning that Article X, Section 6, of the Montana Constitution clearly prohibits the Conrad School District from allowing Tami to participate in public school sports.

The critical facts of this case are that Tami is enrolled in the Conrad Christian School, a sectarian educational facility; she is not enrolled in the Conrad public school system. Tami seeks to play on public school athletic teams for social purposes and camaraderie. The School District refused to allow her to do so pursuant to its policy limiting participation to students enrolled full time in the public school.

Under these facts, Tami asserts a constitutional right to participate under Article X, Section 1, of the Montana Constitution. The Court relies on Bartmess in concluding that Tami has such a constitutional right. It then applies the Bartmess middle-tier scrutiny and concludes that the School District's policy decision to restrict participation in extracurricular activities in order to effectively integrate academics and extracurricular activities is more important than Tami's interest in participating. It holds that the School District's policy does not violate the Montana Constitution.

While I agree that the policy does not violate the Montana Constitution, it is my view that Bartmess is inapplicable under the facts now before us with regard to both the constitutional right to participate and the resulting application of middle-tier scrutiny. In Bartmess, the challenge to the 2.0 GPA rule for participation in extracurricular activities was asserted by students enrolled full

time in the public schools.  We held that a public school student's right to participate in extracurricular activities offered by the public school system in which the student is enrolled is entitled to some degree of constitutional protection.

Unlike in Bartmess, however, the right being asserted by Tami is totally separate and apart from any asserted right to participate in the overall educational system of the School District.  She has a right, of course, to attend public schools but has chosen not to do so.  Thus, she does not have the same right to participate as the students in Bartmess.  I simply do not perceive any tie to Article X, Section 1, of the Montana Constitution such as existed in Bartmess and, as a result, middle-tier scrutiny is not appropriate.

In any event, the Montana Constitution contains a provision which affirmatively precludes the School District from permitting Tami to participate and which, therefore, provides the appropriate basis on which to resolve the present case.  That provision-- Article X, Section 6, of the Montana Constitution--is discussed in Justice Nelson's special concurring opinion and needs no further discussion here.  I join in that portion of Justice Nelson's opinion.

Tami advances several cases, including a recent United States Supreme Court case, which she contends establish that no constitutional problems involving separation of church and state arise by allowing her to participate in public school athletics. In particular, she relies on Zobrest v. Catalina Foothills School Dist. (1993), 509 U.S. 1, 13-14, 113 S.Ct. 2462, 2469, 125 L.Ed.2d 1, 14, in which the Supreme Court held that the "no establishment of religion" clause in the First Amendment to the United States Constitution does not bar a public school district from providing a sign language interpreter to accompany a deaf student to classes at a sectarian school where the service was part of a general governmental program.  As Justice Nelson points out, however, the First Amendment generally prohibits only direct aid.  Article X, Section 6, of the Montana Constitution, on the other hand, prohibits school districts from extending both direct and indirect aid to sectarian schools.  Thus, the federal and sister state cases on which Tami relies have no application to the unique and broad proscription contained in the Montana Constitution regarding aid to sectarian schools.

I join the Court in affirming the District Court, although I would accomplish that result under a different analysis.


/S/  KARLA M. GRAY