No. 01-633

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 242

ROB GRABOW,

Petitioner and Appellant,

v.

THE MONTANA HIGH SCHOOL ASSOCIATION,
a nonprofit corporation, LIVINGSTON HIGH SCHOOL
DISTRICT NO. 1, LIVINGSTON HIGH SCHOOL
DISTRICT NO 1 SCHOOL BOARD, and PARK HIGH SCHOOL,

Respondents and Respondents.

APPEAL FROM:     District Court of the First Judicial District,
                 In and for the County of Lewis and Clark,
                 The Honorable Jeffrey M. Sherlock, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

            Stephen M. Frankino, Hughes, Kellner, Sullivan & Alke, Helena, Montana

        For Respondent Montana High School Association:

            Jock O. Anderson, Gough, Shanahan, Johnson & Waterman, Helena, Montana

        For Respondent Livingston School District:

            Laurence R. Martin, Felt, Martin, Frazier, Jacobs & Rapkoch, Billings, Montana

        For Amicus Superintendent of Public Instruction:

            Jeffrey A. Weldon, Office of Public Instruction, Helena, Montana

        For Amicus Montana School Boards Association:

            Elizabeth A. Kaleva, Montana School Boards Association, Helena, Montana

                            Argued and Submitted:  May 9, 2002
                                       Decided:   November 4, 2002

Filed:

        _____
                            Clerk

Justice Jim Regnier delivered the Opinion of the Court.

¶1   Rob Grabow sought a declaratory judgment and injunctive relief against the Montana High School Association (the "MHSA") in the First Judicial District Court, Lewis and Clark County. The court denied Grabow's request, and he immediately appealed. We granted his request for a preliminary injunction by our Order dated December 23, 1999. On the merits of his appeal, we declared one issue moot but remanded to the District Court on the others. On remand, the District Court ruled against Grabow. Grabow appeals and we affirm.

¶2   The following issues are dispositive of this appeal:

¶3   1.   Did our Order of December 23, 1999, entitle Grabow to attorney's fees?

¶4   2.   May the Livingston School District contract with the MHSA to consent to be bound by the MHSA's rules?

BACKGROUND

¶5   For purposes of this appeal, we will summarize the facts, which we more fully set forth in *Grabow v. Montana High Sch. Ass'n*, 2000 MT 159, ¶¶ 6-13, 300 Mont. 227, ¶¶ 6-13, 3 P.3d 650, ¶¶ 6-13.

¶6   Grabow enrolled at Park High School in Livingston, Montana, in the fall of 1999. After he enrolled, the MHSA informed Grabow that he could not participate in basketball because of its semester rule. The semester rule essentially states that students each have eight consecutive semesters within which they may participate in MHSA contests. Grabow, the MHSA determined, did not meet this requirement.

2

¶7    The MHSA is a nonprofit association that has existed since 1921.   It supervises, regulates and administers interscholastic activities between its member high schools.   Delegates from the member schools meet each year to conduct the business of the MHSA, which a staff and seven member Board of Control then administer. The MHSA classifies schools into four classifications; each of which, along with the Montana School Boards Association, Office of Public Instruction and Governor, elects one member of the Board of Control.

¶8    All public and private high schools in Montana that the Montana Board of Public Education accredits may join the MHSA. Membership is voluntary and has consisted of 182 public and private schools during the relevant times of this appeal.   Park High School, which Grabow attended, is a member of the MHSA.   The Board of Trustees (the "Board") for the school district in which Park High School is located meets each year to consider and vote on whether to rejoin the MHSA.   Each year, the Board renews its membership by signing a membership form.

¶9    Before the MHSA's annual meeting, the Board receives and considers any proposed changes to the MHSA's rules and regulations. The Board then instructs its representative on how to vote.   As a member of the MHSA, the Livingston School District also had the power to submit proposed changes at the MHSA's annual meeting.

¶10  Grabow filed a complaint with the District Court seeking relief from the MHSA's decision to declare him ineligible to play basketball.   The District Court ruled against Grabow, and Grabow

3

appealed. On appeal, we dismissed portions of Grabow's appeal as moot. We remanded, however, Grabow's claims that he was entitled to attorney's fees and that the Board had unlawfully delegated its discretionary functions to the MHSA. The District Court ruled against Grabow on both issues. Grabow now appeals.

## STANDARD OF REVIEW

¶11 When reviewing a district court's conclusions of law, we determine whether they are correct. *See Montanans for the Responsible Use of the School Trust v. State ex rel. Board of Land Comm'rs*, 1999 MT 263, ¶ 11, 296 Mont. 402, ¶ 11, 989 P.2d 800, ¶ 11; *Steer, Inc. v. Department of Revenue* (1990), 245 Mont. 470, 474-75, 803 P.2d 601, 603.

## ISSUE ONE

¶12 Did our Order of December 23, 1999, entitle Grabow to attorney's fees?

¶13 Grabow argues that our December 23, 1999, Order, which granted him a preliminary and permanent injunction, entitles him to attorney's fees under 42 U.S.C. § 1988 and the private attorney general doctrine. We disagree.

¶14 To receive attorney's fees under § 1988, a party must prevail in an action to enforce 42 U.S.C. § 1983. *See* 42 U.S.C. § 1988. The District Court concluded that Grabow had not "prevailed" in this case for purposes of § 1988 because he had not received a final judgment in his favor. Although Grabow cites several cases that support his argument that receiving injunctive relief amounts to prevailing under § 1988, his claim still must fail. Even if an

4

award of injunctive relief amounts to prevailing under § 1988, our order granting him that injunctive relief had nothing to do with § 1983.

¶15 Although Grabow alleges that his Complaint clearly set forth a § 1983 claim, it carried no reference to § 1983 or § 1988. Instead, his Complaint cited only the Montana Constitution and Montana case law. Grabow nevertheless argues that, although his Complaint contained no reference to § 1983 or § 1988, the parties extensively briefed and argued the issue of attorney's fees under § 1988 before the District Court. The District Court, however, consistently ruled against him. He thus clearly cannot claim that he "prevailed" there.

¶16 As for our Order granting him injunctive relief, we never cited § 1983, § 1988 or any other federal law. Instead, we cited exclusively Montana law, like Grabow did in his Complaint. We thus conclude that Grabow did not prevail under § 1983 and, therefore, is not entitled to attorney's fees under § 1988.

¶17 Without a specific contractual or statutory grant, Montana law typically does not entitle the prevailing party to an award of attorney fees. *See Foy v. Anderson* (1978), 176 Mont. 507, 511, 580 P.2d 114, 116. Courts have created exceptions to this rule, including the private attorney general exception. *See School Trust*, ¶ 67. Grabow asserts that our Order entitles him to attorney's fees under the three-part test that we set forth in *School Trust.* That case, however, involved a controversy in which the party seeking attorney's fees had prevailed on the merits

5

before the district court, which we later affirmed. We will not address the issue of attorney's fees until a party reaches a final determination of the underlying controversy in their favor. *See Dreyer v. Board of Trustees* (1981), 193 Mont. 95, 99, 630 P.2d 226, 228.

¶18 Here, the District Court neither issued a preliminary injunction nor reached the merits of Grabow's claim. In our Order on Grabow's petition, we granted an injunction in favor of Grabow but noted only that Grabow had shown a likelihood of prevailing on the merits of his appeal. On appeal, we decided that Grabow's constitutional argument had become moot.

¶19 Grabow cites several non-Montana cases supporting his argument that he prevailed in this matter. None, however, bear on the private attorney general exception as established under Montana law. We have clearly held that awarding attorney's fees without a determination of the merits against the other party "violates the most fundamental right of due process – the right to appear and be heard on the merits of their adversaries' complaint." *See Dreyer*, 193 Mont. at 101, 630 P.2d at 229.

¶20 Because our Order did not involve § 1983 and never reached the merits of Grabow's claim, we conclude that it does not entitle Grabow to attorney's fees.

ISSUE TWO

¶21 May the Livingston School District contract with the MHSA to consent to be bound by the MHSA's rules?

6

¶22 The Montana Constitution vests school board trustees with the power to supervise and control the schools in their district. *See* Mont. Const. Art. X, § 8. The Montana Code, in turn, authorizes trustees to adopt policies and perform any duties necessary to carry out their legal requirements. *See generally* §§ 20-3-323 & -324, MCA. The pivotal question in this appeal is what powers do trustees have regarding interscholastic athletics.

¶23 The difficulty in answering this question arises in that the Montana Legislature provides only a single reference to extracurricular activities. Section 20-5-201(3), MCA, allows school trustees to exclude students from participating in "school activities" as a sanction for violating school duties. Grabow interprets this code section to mean that the board of trustees has the exclusive power to decide a student's eligibility to participate in extracurricular activities. We disagree.

¶24 Section 20-5-201, MCA, enumerates certain duties to which a pupil must adhere. If a student violates these duties, that code section sets forth sanctions to which a pupil may become subject. The subsection that Grabow relies on, subsection (3), states that "[i]n addition to the sanctions prescribed in this section, the trustees of a high school district may deny a high school pupil the honor of participating . . . in school activities." Grabow argues that this language entitles only trustees to preclude students from participating in school activities.

¶25 The scope of this subsection, however, is more limited than that. Under subsection (3), a trustee may only take action when an

7

"incident or infraction causing the consideration has been investigated and the trustees have determined that the high school pupil was involved in the incident or infraction." Section 20-5-201(3), MCA. Here, no one alleges that Grabow committed an incident or infraction. Section 20-5-201(3), MCA, is simply not applicable to this matter. As we noted above, the Montana Code is otherwise silent as to the enforcement of eligibility rules.

¶26 Students clearly have the right to participate in extracurricular activities. *See Moran v. School Dist. No. 7, Yellowstone County* (D. Mont. 1972), 350 F.Supp. 1180, 1184. That right to participate in extracurricular activities is a right that is subject to constitutional protection. *See State ex rel. Bartmess v. Board of Trustees of Sch. Dist. No. 1* (1986), 223 Mont. 269, 275, 726 P.2d 801, 805. Some entity or group of entities, therefore, must implicitly have the power to govern the various aspects of extracurricular activities, of which interscholastic sports is a part.

¶27 Grabow argues, however, that the Board unlawfully delegates the authority to govern interscholastic activities by violating a student's right to administrative appeal. The Board allegedly does this by binding itself to the MHSA's rules and decisions. Grabow points out that § 20-3-210, MCA, states that the county superintendent "shall hear and decide all matters of controversy . . . as a result of decisions of the trustees." Under the MHSA's structure, however, students have no mechanism of administrative appeal from an MHSA decision. Grabow contends that the Board thus

8

divests students of their right to review by leaving final decision making authority with the MHSA. Because the legislature never granted school boards the power to delegate decision making authority to the MHSA, Grabow asserts that this delegation is unlawful.

¶28 Other jurisdictions are split on the issue of whether a voluntary membership in a high school athletic association is an unlawful delegation of authority. *Compare Quimby v. School Dist. No. 21 of Pinal County* (Ariz. Ct. App. 1969), 455 P.2d 1019 (concluding that becoming a member of an association was not a delegation of governmental power) *with Bunger v. Iowa High Sch. Athletic Ass'n* (Iowa 1972), 197 N.W.2d 555 (concluding that membership was a delegation of power). Ultimately, we find the *Quimby* line of reasoning more persuasive. We conclude that becoming a member of the MHSA is not an unlawful delegation of a governmental power.

¶29 Competitive interscholastic athletics requires rules for competition. *See Quimby*, 455 P.2d at 1021. The MHSA establishes its rules through the vote of its members. If a school board disagrees with any of the rules, it may refuse to participate in the MHSA. Accordingly, the school district makes the rules of the association its own by participating. *See Quimby*, 455 P.2d at 1021-22; *Anderson v. South Dakota High Sch. Activities Ass'n* (S.D. 1976), 247 N.W.2d 481, 484.

¶30 We acknowledge that a school district would undoubtedly have a difficult time finding other schools against which to compete if it

9

decided to withdraw from the MHSA. Such a consequence, however, does not render membership in the MHSA involuntary. Instead, it simply highlights the nature of organized athletics. Interscholastic competition would simply not exist unless some independent entity serves as a neutral arbiter to establish and monitor eligibility rules and the ground rules for play. While the consequences may weigh on a district's decision to withdraw from the MHSA, the district still remains free to do so.

¶31 While school districts may adopt the MHSA's eligibility rules as their own, enforcement of these rules is a unique power derived through mutual agreement that no individual school board possesses. School boards have no power of supervision or control over schools outside their own school district. *See* Mont. Const. Art. X, § 8 (stating that supervision and control by trustees exist "*in each* school district" (emphasis added)). The Helena School Board, for instance, could not enforce eligibility rules on students in Park High School in Livingston. School boards thus must establish a neutral referee. In reality, eligibility rules do not exist to ensure that a district's own students meet certain requirements. Such rules ensure that the students of a competing district abide by the rules.

¶32 The MHSA is thus exercising a power over students that individual school boards never had. Therefore, although the Board adopted the MHSA rules as their own, the MHSA's decision to exclude Grabow from participating in basketball, in effect, was not the Board's own decision. The other school districts effectively made

10

the decision. Section 20-3-210, MCA, only applies to "matters of controversy arising *in the county.*" (emphasis added). Therefore, Grabow has no right to administrative appeal of MHSA decisions under § 20-3-210, MCA.

¶33 To remedy this lack of administrative review, Grabow suggests that we order the Office of Public Instruction (the "OPI") to review all of the MHSA's decisions regarding eligibility. No authority, however, empowers the OPI to review decisions made by the MHSA. Without a specific legislative mandate, we will not create an additional level of administrative review. "[T]o the extent that there is an error and to the extent that the statute does not accurately reflect the Legislature's clearly expressed intention, it is appropriate that the Legislature correct the problem, not the courts." *George v. Montana Bd. of Pardons*, 2001 MT 163, ¶ 20, 306 Mont. 115, ¶ 20, 30 P.3d 1065, ¶ 20 (citing *State v. Goebel,* 2001 MT 73, ¶ 23, 305 Mont. 53, ¶ 23, 31 P.3d 335, ¶ 23).

¶34 While the MHSA may not be accountable to the OPI, any decisions made by the MHSA still must comply with the constitution. Simply creating an additional level of administrative review will not ensure this. Adding additional levels of review instead may work to a student's detriment.

¶35 An aggrieved student cannot seek judicial review of an administrative decision until the student has exhausted his or her administrative remedies. *See* § 2-4-702, MCA. This rule allows administrative agencies to make a factual record and to correct any

11

errors within their specific expertise before a court interferes. *See Bitterroot River Protection Ass'n v. Bitterroot Conservation Dist.,* 2002 MT 66, ¶ 22, 309 Mont. 207, ¶ 22, 45 P.3d 24, ¶ 22. We do this in the interest of both judicial economy and agency efficiency. *See Bitterroot,* ¶ 22. If we required a student to navigate through additional levels of administrative review, however, the athletic season in which the student wished to play would likely pass.

¶36 As the system functions now, students may immediately seek judicial review after the MHSA has reached a final conclusion. Grabow, for instance, got what he ultimately sought by directly seeking judicial review: an injunction that allowed him to play basketball. In reaching our conclusion in this matter, we wish to emphasize that we neither endorse nor criticize the function of the MHSA or its eligibility rules. The sole issue before us was whether the Livingston School District could contract with the MHSA and thus be bound by its rules; we conclude that it can.

¶37 Affirmed.

/S/ JIM REGNIER


/S/ KARLA M. GRAY
/S/ TERRY N. TRIEWEILER
/S/ PATRICIA COTTER

12

Justice Jim Rice specially concurring.

¶38 I concur with the Court's holding herein, although not with the entirety of the rationale set forth in the discussion of Issue 2.

¶39 I agree with the Court's conclusion that MHSA exerts a unique power derived through mutual agreement of the districts, which no individual school board possesses. I cannot draw from that conclusion, however, that the decision to exclude Grabow was made by "the other school districts" and did not implicate the Board of Trustees for Grabow's own school. Although a single school district cannot make interscholastic decisions by itself, that district nonetheless remains responsible for its decision to subject its own students to the rules of the Association, and therefore, cannot escape the consequences of decisions made pursuant to those rules. As the District Court found, "[w]hen Park High School submitted its annual dues remittance to the MHSA, it adopted all of the rules and regulations of the MHSA as its own." Therefore, I cannot agree with the rationale that all of the other school districts were implicated in the decision to exclude Grabow, but that the Livingston School District was excused from responsibility for that decision.

¶40 Such a conclusion raises the question of whether the District extinguished Grabow's right of appeal to the county and state superintendents by its delegation of rule enforcement to MHSA. Grabow contends that a decision to exclude him from athletic participation is appealable to the county and state superintendents

13

pursuant to § 20-3-210, MCA (1997), but that this right was extinguished by his District's participation in MHSA.

¶41 First, it should be remembered that Grabow did not seek such an appeal in this case and, therefore, he should not be heard to complain that such an appeal had been denied or extinguished. On appeal to this Court, he has simply asserted that because "MHSA is not referenced in any statute . . . there is no appeals process," and therefore, he was forced to file for relief directly in the District Court. However, he did not test the provisions of § 20-3-210, MCA, by requesting review of MHSA's decision by the county superintendent. He did not assert the loss of an appeal in his complaint filed in District Court, and consequently, the issue was not addressed by the District Court in its findings of fact and conclusions of law entered on November 24, 1999. It was not until March 30, 2001, following this Court's remand after the first appeal, that Grabow asserted, in his argument for summary judgment, that his appeal rights to the county superintendent had been extinguished by his District's delegation to MHSA.

¶42 Further, given the nature of Grabow's claims, the District Court was the only appropriate forum in which to proceed. Grabow had asked MHSA to consider his constitutional right to participate based upon *Kaptein v. Conrad School District* (1997), 281 Mont. 152, 931 P.2d 1311, and when MHSA declined to do so, he filed a complaint in the District Court, the gravamen of which was constitutional relief. The courts are the only forum in which Grabow could pursue adjudication of the constitutional issue he was

14

raising. The constitutional issues could not have been properly resolved by the school board or by the county superintendent of schools. As we held in *Brisendine v. State, Dept. of Commerce* (1992), 253 Mont. 361, 366, 833 P.2d 1019, 1021-22:

> Generally, we have held that before a party can seek declaratory relief, he must exhaust all administrative remedies. *Mitchell v. Town of West Yellowstone* (1988), 235 Mont. 104, 108, 765 P.2d 745, 747-48. However, the exhaustive doctrine does not apply when constitutional issues are raised. *Mitchell*, 765 P.2d at 748. Thus, when a party raises a bona fide constitutional claim, he has a right to resort to declaratory judgment, rather than submitting himself to an ordinance or rule he deems unconstitutional. *Mitchell*, 765 P.2d at 748. Our reasoning is based upon the lack of authority in administrative agencies to determine constitutional issues. *Mitchell*, 765 P.2d at 748. Such decisions rest within the exclusive jurisdiction of the courts. *Mitchell*, 765 P.2d at 748.

¶43 For the reasons set forth herein, I concur in the Court's decision that Grabow's appeal rights were not denied and that the district's membership in MHSA was not an unlawful delegation of a governmental power.

/S/ JIM RICE

15

Justice W. William Leaphart dissenting.

¶44 I dissent as to issue number two: "May the Livingston School District contract with the MHSA to consent to be bound by the MHSA's rules?"

¶45 The Court, through legal artifice, concludes that the School District has not unconstitutionally delegated its authority to govern interscholastic activity because, in participating in the MHSA, the School Board makes the rules of the Association its own. I submit that this result may be practical, but it is, nonetheless, a legal fiction.

¶46 The Supreme Court of Iowa addressed a very similar issue in *Bunger v. Iowa High School Athletic Ass'n* (Iowa 1972), 197 N.W.2d 555. At issue in *Bunger* was a "Good Conduct" rule of the Iowa High School Association (the "Association"). The Association was an unincorporated association in charge of boys' athletic events throughout the State of Iowa. Member schools agreed to abide by the constitution and bylaws of the Association. In an effort to address the use of alcoholic beverages by athletes, the Association adopted what was known as the "Good Conduct" rule, which, in turn contained the "beer rule." The "Good Conduct" rule was challenged by a young athlete who was suspended from playing football for a period of six weeks for being in an automobile containing a case of beer.

¶47 The Iowa Court began its analysis by noting that the legislature provided for school districts to be under the control of directors. The legislature further provided that the affairs of

16

each school were to be conducted by the directors and that the board "shall make rules for its own government and that of the . . . pupils . . . and require the performance of duties . . . imposed by law and the rules." *Bunger*, 197 N.W.2d at 559.

¶48 The question before the court was thus posed as follows: Can a school board re-delegate its rule-making power regarding pupils to some other organization? The court held that the legislature had delegated rule-making to the boards, and the general principle is "that while a public board or body may authorize performance of ministerial or administrative functions by others, it cannot re-delegate matters of judgment or discretion." *Bunger*, 197 N.W.2d at 560. The court recited the general principle of law expressed in the maxim "delegates non potest delegare," that a delegated power may not be further delegated by the person to whom such power is delegated.

¶49 Like the Montana High School Association, the Iowa Association contended that the "Good Conduct" rule was actually a rule of each individual board, in that each board agreed to abide by the rules when it joined the Association. "By joining the association, IHSAA says, each board promulgate[d] IHSAA's rules as its own." *Bunger*, 197 N.W.2d at 561. The Iowa court rejected this argument as being inconsistent with the realities of the situation. "Bearing in mind that a school board cannot re-delegate its rule-making power, how can we say that a school which votes against a proposed rule has itself promulgated that rule?" *Id*. The court reasoned that the schools have no choice as to the rules it will accept. "It must

17

take them all and abdicate its nondelegable responsibility to select the rules it wishes to have." *Id.*

¶50 The court further noted that a school which becomes dissatisfied with a rule has no power to repeal the rule. "To say the school can withdraw from IHSAA is no answer. If it leaves IHSAA voluntarily, or involuntarily for violating the rule, its boys' interscholastic athletic program is at an end . . . . Its hands are tied. The power is actually in the association, not each school board where the statute places it." *Bunger*, 197 N.W.2d at 561.

¶51 The Iowa Court then discussed the fact that Iowa (unlike Montana) has a statute which authorizes schools to belong to qualifying organizations and participate in interscholastic activities sponsored by such organizations. Despite this statutory recognition of organizations such as the Iowa High School Athletic Association, the court concluded that the statute could not be "stretched to mean that schools may turn over their statutory rule-making authority to such organizations." *Bunger*, 197 N.W.2d at 562.

¶52 Finally, the Iowa Association argued that the statutes allowed the Association to promulgate rules if approved by the state department of public instruction. The court rejected this contention holding that the law required the state board of public instruction to adopt rules concerning eligibility for interscholastic contests. "Moreover, since promulgation of eligibility rules involves judgment and discretion, . . . the State Board cannot re-delegate its rule-making authority . . . any

18

more than a school board can re-delegate its rule-making authority . . . ." *Bunger*, 197 N.W.2d at 563.

¶53  In conclusion, the Iowa Court held:

> The rule before us is, in fact, a rule of IHSAA and not of the Waverly-Shell Rock Board of Education or of the State Board.  Neither of the latter public bodies could re-delegate its rule-making authority.  We hold that the rule is invalid for want of authority in IHSAA to promulgate it.

*Bunger*,          197          N.W.2d          at          563.

¶54  I find the reasoning of the Iowa Supreme Court to be even more compelling in the present case than in the Iowa situation.  In Montana, the school board trustees derive their power not from legislation, as in Iowa, but from the state constitution itself. Article X, Section 8, of the Montana Constitution grants school board trustees the power to supervise and control the schools in their district. Further, the Board of Public Education has the constitutional authority to exercise "general supervision over the public school system."  Art. X, Sec. 9(3)(a), Mont. Const.  The school boards cannot abdicate their constitutional grants of authority by re-delegating their authority to control and supervise, and thereby determine athletic eligibility decisions, to a voluntary association.  Furthermore, it is noteworthy that, in Iowa, the state law recognized the existence of high school athletic associations and allowed such associations to make certain rules subject to approval of the State Board of Public Education. Unlike the situation in Iowa, there is no legislative recognition of  high school athletic associations in Montana law.  Thus the

19

argument for allowing a Montana school board to re-delegate its rule-making authority to such an association is even more tenuous than in the *Bunger* case. The Iowa Supreme Court reaffirmed its holding in *Bunger* in *Gabrilson v. Flynn* that "[i]t is a fundamental tenet that a school board may not abrogate its power to regulate the affairs of the district to an agent." *Gabrilson v. Flynn* (Iowa 1996), 554 N.W.2d 267, 276.

¶55 I understand the practical need to achieve uniformity of eligibility requirements for participation in interscholastic competition. However, that goal cannot be accomplished by permitting constitutionally created school boards to abdicate their constitutional responsibilities to "control" and "supervise" in favor of a private association over which the school boards, individually, have no control. Uniformity of eligibility rules is a question that perhaps can be addressed by the Board of Public Education under its state-wide constitutional power to exercise "general supervision over the public school system." Art. X, Sec. 9(3)(a), Mont. Const.


                                    /S/ W. WILLIAM LEAPHART


Justice James C. Nelson joins in the foregoing dissent of Justice Leaphart.


                                    /S/ JAMES C. NELSON


20

Justice James C. Nelson dissents:

¶56 I join Justice Leaphart's dissenting opinion and add the following.

¶57 Underlying the majority's opinion is the pragmatic acknowledgment that Montana has no statutory scheme for dealing with interscholastic sports, rules and rules infractions, or for the protection of the due process and appeal rights of student athletes. The MHSA exists because of a complete void in Montana law. As Justice Leaphart points out, local school boards have, actually or effectively, unlawfully delegated to the MHSA certain of their important constitutional and statutory duties and authority over students and students' sporting activities because there is no alternative statutory scheme. Our opinion recognizes this as fact. As the majority candidly concede, "[i]nterscholastic competition would simply not exist unless some independent entity serves as a neutral arbiter to establish and monitor eligibility rules and the ground rules for play."

¶58 However, to suggest, as do the Respondents and *Amici* and as does the Court, that membership in the MHSA, being "voluntary," a school or school district has a viable option to withdraw from the organization, is preposterous. The fact is that a school district either plays ball with the MHSA or it doesn't play at all-- literally. It will be the rare board of trustees that pulls out of the MHSA and, in so doing, forfeits the opportunity for local students to participate in interscholastic sports and the chance for some to win scholarships, along with the substantial revenue,

21

support and entertainment that such sporting events and tournaments provide to the community.

¶59 The bottom line is that the MHSA, like the elephant in the room, is as much a part of Montana's state and local school structure and operations as are the students, the teachers, the administration, the classes, and the extra-curricular activities.

¶60 Yet, despite this pivotal role in Montana's educational landscape, the MHSA exists and functions totally without legislative authorization, regulation or oversight. Indeed, the MHSA--whose *raison d'etre* is regulating interscholastic sports, sporting events and student athletes--is accountable to no State office, to no State agency, to no State officer and to no State elected official. Although the Governor and Superintendent of Public Instruction--concededly without any statutory authority-- appoint members to MHSA's Board of Control, these, among the highest of Montana's elected executive-branch officers, have no official say in what the MHSA does or how it goes about doing it.

¶61 All of that said, this is not really a criticism of the MHSA. It is a corollary to the rule "if you build it they will come" that "if you don't build it, someone else will." The MHSA exists because Montana has no laws to govern and regulate the interscholastic sporting activities of Montana's students. Quite simply, in default of a comprehensive set of laws, a private organization--the MHSA--filled the breach.

¶62 My only reason for stating the obvious, is that, under Article X, Section 1 of Montana's Constitution, it is the State's

responsibility to provide a basic system of free quality public elementary and secondary schools and equal educational opportunity to each person. *Arguendo*, participation in interscholastic sports is part of that constitutionally-protected educational opportunity--at least we have tacitly so held. *See State ex rel. Bartmess v. Board of Trustees* (1986), 223 Mont. 269, 726 P.2d 801; *Kaptein v. Conrad Sch. Dist.* (1997), 281 Mont. 152, 931 P.2d 1311. It follows, then, that it is the State's obligation to enact laws that will fairly and efficiently govern, regulate and protect student athletes' rights to participate in this aspect of their education. Under Article X, Section 1, the Legislature has an affirmative duty to legislate in this area. Its constitutional obligation cannot, by inaction, be foisted off onto a private organization. Yet, that is exactly what has happened.

¶63 In the case at bar, we are dealing with the complete abrogation by the State of its responsibility to enact laws regulating publicly funded interscholastic sporting activities, sponsored by taxpayer financed schools, played in taxpayer financed facilities, all governed by publicly elected school district trustees. More to the point, this case involves the complete abrogation by the State of its responsibility to enact a statutory hearing and appeals process to protect student athletes who have constitutional rights to participate in extra-curricular, interscholastic sporting activities.

¶64 As the majority point out, in the context of infractions of and enforcement of MHSA's eligibility rules, there is no law except

23

that which MHSA makes for itself. And, short of resort to the courts, there is no hearings or appeals process to protect student athletes' constitutional rights of participation except that which the MHSA chooses to provide.[1] The statutes that do exist--§§ 20-5-201(3), MCA and 20-3-210, MCA--do not work. Even assuming one could pound the round peg of the student athlete into the square hole of the existing law, the process is too slow and too cumbersome.

¶65 Unfortunately, since the existing statutory procedure is worthless, these sorts of cases, with some non-substantial deviations, ultimately require students and their parents to hire counsel and sue for temporary or preliminary injunctive relief in district courts when the student is deprived of his or her actual or perceived right to participate in an interscholastic sporting activity. Typically injunctive relief is granted (if not by the trial court, by this Court) so the student can play--eligible or not. By the time the legal proceedings have finally run their course, the student has graduated (or, at least, has finished the season), and about all that is left is for this Court to engage in the essentially meaningless task of affirming or reversing the trial court, or deciding not to decide the case at all. *See J.M. v. Montana High Sch. Ass'n* (1994), 265 Mont. 230, 875 P.2d 1026; *M.H. v. Montana High Sch. Ass'n* (1996), 280 Mont. 123, 929 P.2d 239;

---

[1] Which, at least in this case, went forward at Grabow's personal expense.

24

*Grabow v. Montana High Sch. Ass'n*, 2000 MT 159, 300 Mont. 227, 3 P.3d 650.

¶66 The long and short of it is that instead of a comprehensive and workable statutory and administrative scheme to govern interscholastic sports, sporting activities and student athletes-- including an efficient hearing and appeals procedure--we have an *ad hoc* process that (a) forces students and their parents into time consuming litigation; (b) insures that the student will play under court order whether or not he or she is actually eligible; (c) costs the student's parents, and (through their membership dues in the MHSA) school districts, scarce funds that could and should otherwise be spent on education; (d) ultimately produces a meaningless result; and (e) turns the courts into little more than enablers of the whole dysfunctional system.

¶67 I can understand *why* the majority chose the course it did. To do otherwise would undo interscholastic sports--and, thus, life--as we know it. I cannot join our decision, however. As Justice Leaphart states, the legal underpinning for the majority opinion is a fiction. We are merely giving chicken soup to a corpse.

¶68 The Legislature is obligated to fix this mess, not the courts. I would provide the proper branch of government the opportunity to do so.

¶69 I dissent.

/S/ JAMES C. NELSON